UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

FILED
2008 AUG 15 AM 8:50
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY_____ DEPUTY

In the Matter of the Seizure of
(Address or brief description of property or premises to be seized)

One lady's engagement ring containing a 2.00 carat weight HVS2 Princess cut diamond center stone set in a 14k white gold diamond mounting with 2 bezel and channel round diamonds 0.79 in total carat weight

**APPLICATION AND AFFIDAVIT**

**FOR SEIZURE WARRANT**

**CASE NUMBER:**

'08 MJ 2523

I, __Angela K. Clark__, being duly sworn depose and say:

I am a __Special Agent with the Internal Revenue Service__, and have reason to believe in the Southern District
         Official Title

California, there is now certain property, namely:

> One lady's engagement ring containing a 2.00 carat weight HVS2 Princess cut diamond center stone set in a 14k white gold diamond mounting with 2 bezel and channel round diamonds 0.79 in total carat weight,

which represents drug proceeds subject to forfeiture pursuant to Title 21, United States Code, Section 881 (a)(6) (proceeds of drug trafficking), and was acquired with funds traceable to a violation of Title 18, United States Code, Section 1956 and 1957 (money laundering), and subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1). The facts to support a finding of Probable Cause are as follows:

SEE ATTACHED AFFIDAVIT, WHICH IS HEREBY INCORPORATED BY REFERENCE AND MADE A PART HEREOF.

_____
Signature of Affiant

Sworn to before me, and subscribed in my presence

8/14/2008 at 4:05 p.m.          at     San Diego, California
Date/Time issued

Honorable __Ruben B. Brooks__

__United States Magistrate Judge__          _____
Name & Title of Judicial Officer          Signature of Judicial Officer

State of California   )
                      )
County of San Diego   )

## AFFIDAVIT IN SUPPORT OF APPLICATION
## FOR SEIZURE WARRANT

I, Angela K. Clark, hereby state and declare as follows:

### TRAINING AND EXPERIENCE

1. I am a Special Agent with the Internal Revenue Service (IRS), Criminal Investigation, in the Southern District of California, Los Angeles Field Office - San Diego Post of Duty and have been so employed since July 1998. As a Special Agent, I am a Federal Law Enforcement Officer within the meaning of Rule 41(b) of the federal Rules and Criminal Procedure, that is, a government agent engaged in the enforcement of the criminal laws of the United States and thereby authorized to request the issuance of federal seizure warrants. I was trained at the Federal Law Enforcement Training Center (FLETC) in accounting and financial investigative techniques, criminal law, tax law, Constitutional law, the Fourth Amendment of the Constitution, search and seizures, federal court procedures, rules of evidence, building entry and arrest procedures. I have participated in enforcement actions including surveillance, arrest warrants, seizure warrants and search warrants. I received a Bachelor of Science degree in Accounting from West Virginia University, Institute of Technology Business School.

2. During the course of my employment as a Special Agent with the IRS, I have directed or assisted in numerous investigations concerning Title 18, money laundering violations, Title 26, federal income tax violations, and Title 31, Bank Secrecy Act violations. These investigations focused on individuals deriving income from legal and illegal sources. I am currently the Coordinator for the Los Angeles Field Office, San Diego Post of Duty, Asset Forfeiture Program.

In this capacity, I have attended specialized training in the laws and procedures governing administrative, civil judicial and criminal judicial asset forfeiture.

3. The information set forth in this affidavit has been provided to me by IRS SA Deliena Chell, agents of the DEA and officers of the El Cajon Police Department. Unless otherwise noted, whenever in this Affidavit I assert that a statement was made, the information was provided by another law enforcement officer (who may have had either direct or hearsay knowledge of the statement) to whom I have spoken or whose report I have read and reviewed. Likewise, information resulting from surveillance, except where otherwise indicated, does not necessarily set forth my own observations but rather has been provided directly or indirectly by other law enforcement officers who conducted such surveillance. This affidavit does not include all of the facts known regarding this investigation; only those sufficient to establish probable cause to seize the lady's diamond engagement ring described more fully below.

4. As a Special Agent, one of my functions is to investigate individuals involved in the laundering of money from illegal sources, and to investigate individuals engaging in financial transactions with funds derived from specified unlawful activities, including income generated from narcotics trafficking, in violation of Titles 18 and 21, of the United States Code.

5. Based on the training I have received and my experience, I have learned the value of reviewing financial documents, including, but not limited to IRS/FINCEN Form 8300, FINCEN Form 104/Currency Transaction Reports (CTR), and others. I have determined that these forms as well as the review of bank account records and other financial records have probative value when investigating violations of the Controlled Substances Act. I know that the courts have ruled that unexplained income is a sign of suspicious unlawful activity.

6. During my employment with IRS, Criminal Investigation, I have participated in cases involving money laundering violations including Title 18, of the United States Code (hereinafter, "USC"), 1956 and 1957. Based on my training and experience I know that:

(a) Any business or trade is required to file a Form 8300 with the IRS when it receives cash payment in the amount over ten thousand dollars $10,000.

(b) Any financial institution is required to file a FINCEN Form 104/Currency Transaction Report (CTR) with FINCEN when there is a financial transaction in currency over ten thousand dollars $10,000.

(c) Narcotics dealers/traffickers very often purchase assets using currency in an attempt to conceal the source of the money from agencies such as the Internal Revenue Service.

(d) Narcotics dealers/traffickers must maintain on hand large amounts of U.S. currency in order to maintain and finance their ongoing narcotics business.

(e) Narcotics dealers/traffickers make deposits into their bank accounts in cash amounts under $10,000 to avoid the filing of a CTR.

(f) Narcotics dealers/traffickers frequently deposit their drug proceeds into their bank account in an attempt to legitimize their ill gotten gains.

### DESCRIPTION OF PROPERTY SUBJECT TO SEIZURE AND FORFEITURE

6. One lady's engagement ring containing a 2.00 carat weight HVS2 Princess cut diamond center stone set in a 14k white gold diamond mounting with 2 bezel and channel round diamonds 0.79 in total carat weight ("diamond engagement ring") currently in the possession of Levi and Sons Fine Jewelers, 309 Parkway Plaza, El Cajon, California, 92020, purchased by Frank Bertolino III.

## STATUTORY BASES FOR FORFEITURE

7. The diamond engagement ring is subject to forfeiture under 21 U.S.C. § 881 (a) (6), which provides in pertinent part:

>(a) Subject property. The following shall be subject to forfeiture to the United States and no property right shall exist in them....
>
>>(6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter.

The diamond engagement ring is also subject to forfeiture under 21 U.S.C. §853(a)(1), which provides in pertinent part:

>(a) Property subject to criminal forfeiture. Any person convicted of a violation of this subchapter ....
>
>>(1) any property constituting or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation.

8. On or about June 9, 2008, within the Southern District of California, the Grand Jury returned an indictment in criminal case number 08cr2107-W charging Frank Bertolino III, and others, with violations of Title 21, United States Code, Section 846 and 841, which indictment also includes a criminal forfeiture allegation pursuant to Section 853.

9. The diamond engagement ring is also subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1) which provides, in pertinent part: "The following property is subject to forfeiture to the United States: (A) any property, real or personal, involved in a transaction or

attempted transaction in violation of section 1956, 1957 ... of this title, or any property traceable to such property." Narcotics trafficking is a form of specified unlawful activity under Title 18, United States Code, Sections 1956 and 1961. The purchase of the diamond engagement ring is a financial transaction under Title 18, United States Code, Section 1956.

FACTS ESTABLISHING PROBABLE CAUSE

10. In February 2007, IRS Special Agent Deliena Chell was contacted by Detectives from the El Cajon Police Department regarding the potential narcotics trafficking and money laundering activities of Frank Bertolino III (hereafter referred to as Frank Bertolino) in the east county portion of San Diego. As described below, during the course of the investigation several purchases of cocaine were made by an undercover police detective. Except where otherwise indicated, all of the cocaine that was purchased by the undercover officer was laboratory tested and conclusively determined to be cocaine at the net weights indicated.

11. On September 7, 2007, during a recorded telephone conversation, Frank Bertolino agreed to meet with undercover police Detective Royal Bates at the 7-Eleven parking lot located at 1498 Jamacha Road, El Cajon, California for the purposes of selling the undercover officer an ounce of cocaine. Thereafter, Bertolino arrived at the 7-Eleven driving a Cadillac Escalade. Detective Bates walked over to the passenger side of Bertolino's vehicle and opened the passenger door. As soon as Detective Bates opened the door, he saw a bag of white powdery substance sitting on the center console in plain view. During the ensuing conversation, which was recorded, Detective Bates handed Frank Bertolino $600 in cash. Frank Bertolino in turn handed Detective Bates a baggie contain approximately 27.8 grams (net weight) of cocaine.

12. On September 12, 2007, during a recorded telephone conversation, Frank Bertolino agreed to meet with Detective Bates at the 7-Eleven parking lot located at 1498 Jamacha Road, El Cajon, California for the purpose of delivering cocaine to Bates. Thereafter, Frank Bertolino arrived at the 7-Eleven parking lot driving a black Range Rover at approximately 2:56 p.m. Detective Bates approached the passenger side of the Range Rover. Frank Bertolino rolled down his window. Frank Bertolino reached into his pocket, pulled out a ziplock baggie containing approximately 14/1 grams (net weight) of cocaine, and handed it to Detective Bates. Detective Bates then handed Frank Bertolino three $100 bills.

13. On October 3, 2007, during a recorded telephone conversation, Frank Bertolino agreed to meet Detective Bates at the 7-Eleven parking lot located at 1498 Jamacha Road, El Cajon, California for the purpose of delivering cocaine to Bates. Thereafter, Frank Bertolino arrived at the 7-Eleven parking lot at 3:26 p.m. driving a silver colored 3 series BMW convertible. A young female (approximately 18 to 23 years of age) was in the passenger seat. Frank Bertolino parked the BMW and got out of his vehicle as Detective Bates got out of his vehicle. Frank Bertolino thereafter handed Detective Bates a baggie containing approximately 28.1 grams (net weight) of cocaine. Detective Bates in turn paid $600 in cash.

14. On October 18, 2007, during a telephone conversation, Frank Bertolino agreed to provide Detective Bates with cocaine at the 7-Eleven parking lot located at 1498 Jamacha Road, El Cajon, California. While Detective Bates was en route to the 7-Eleven parking lot, Frank Bertolino called Detective Bates and said that his brother would be meeting with Detective Bates. Thereafter, Dominick Bertolino arrived at the 7-Eleven parking lot as the passenger in a black BMW 745i Series vehicle driven by an unidentified white male. Detective Bates approached the passenger side of the BMW and gave Dominick Bertolino $600 in cash. Dominick Bertolino in turn handed Detective

Bates a plastic sandwich baggie containing approximately 27.5 grams (net weight) of cocaine. During a telephone call later in the day, Frank Bertolino told Detective Bates that the person that accompanied Dominick Bertolino was a bodyguard.

15. On November 9, 2007, during a telephone conversation, Frank Bertolino agreed to meet Detective Bates at the 7-Eleven parking lot located at 1498 Jamacha Road, El Cajon, California. Thereafter, Frank Bertolino arrived at the 7-Eleven parking lot at approximately 2:05 p.m., driving a white convertible BMW 645ci. Detective Bates approached the passenger side of the BMW and saw Frank Bertolino holding a ziplock baggie containing a white substance. Frank Bertolino handed Detective Bates the baggie, which contained approximately 55.9 grams (net weight) of cocaine. Detective Bates in turn gave $1,200 in cash to Frank Bertolino for the cocaine.

16. On December 4, 2007, during a telephone conversation, Frank Bertolino agreed to meet Detective Bates at the 7-Eleven parking lot located at 1498 Jamacha Road, El Cajon, California for the purpose of delivering cocaine to Bates. Frank Bertolino thereafter arrived at the 7-Eleven parking lot driving a black Ranger Rover at approximately 2:15 p.m.. Detective Bates walked over to the passenger side of the Range Rover, opened the door and got in. At that time, Frank Bertolino handed Detective Bates a plastic baggie containing approximately 83.7 grams (net weight) of cocaine. Detective Bates in turn paid $1,800 in cash to Frank Bertolino.

17. On January 9, 2008, Detective Bates called Frank Bertolino and told him he needed two ounces of cocaine and that he was en route to the 7-Eleven parking lot located at 1498 Jamacha Road, El Cajon, California. Frank Bertolino said that he did not know if he had that much cocaine and he would have to call Detective Bates back. Frank Bertolino called Detective Bates back and said he would be able to provide the cocaine. Thereafter, Frank Bertolino arrived at the 7-Eleven parking lot driving a black Range Rover. Detective Bates got into the left rear passenger seat of the

Range Rover behind Frank Bertolino. Another male, later identified as Shawn Carley, was in the right front passenger seat. Frank Bertolino then delivered a ziplock baggie containing 55.2 grams of cocaine (net weight) to Detective Bates. Detective Bates in turn handed Frank Bertolino $1,200 in cash for the cocaine.

18. On February 1, 2008, Detective Bates called Frank Bertolino and told him he needed two ounces of cocaine. Thereafter, Frank Bertolino arrived at the 7-Eleven parking at 4:01 p.m., at 1498 Jamacha Road, in El Cajon, California, in a Hertz rental white Hummer H3 bearing California license plate number 5ZMX363, driven by a blonde white female. Frank Bertolino got out of the Hummer H3 and walked to over to Detective Bates. During this meeting Frank Bertolino gave Bates two clear plastic baggies containing approximately 55.2 grams (net weight) of cocaine. Detective Bates in turn handed Frank Bertolino $1,200 in cash.

19. On April 3, 2008, Detective Bates purchased approximately three ounces of a white crystalline powder with presumptively tested positive for cocaine from Frank Bertolino at the 7-Eleven parking lot located at 1498 Jamacha Road, El Cajon, California. Bertolino arrived in a white Range Rover SUV which was being driven by a white female adult, who was later identified as Amanda Jean Holland. During the surveillance, the white Range Rover was observed with after market wheels and bearing paper plates saying European Coach. European Coach is a car dealership located on Mission Gorge Road in San Diego, California.

20. On May 16, 2008, Detective Bates placed a recorded telephone call to Frank Bertolino for the purpose of purchasing cocaine. At approximately 9:44 p.m., a white Acura Integra bearing California license plate number 6APU328 arrived at the 7-Eleven parking lot located at 1498 Jamacha Boulevard, El Cajon, California. Dominick Bertolino was driving the Acura and Frank Bertolino was the passenger. Detective Bates approached the driver's window and spoke with Frank

Bertolino. Frank Bertolino handed Bates approximately one ounce of what tested presumptively positive for cocaine. Detective Bates handed $600 in cash to Frank Bertolino.

21. A Federal Grand Jury subpoena was served on Wells Fargo Bank for financial records related to the bank accounts owned or under the control of Frank Bertolino for the period January 1, 2003 through the issuance of the subpoena, May 2007. A review of the bank accounts maintained by Bertolino indicated the majority of his deposits consisted of cash deposit under $10,000.

22. Wells Fargo Bank account number 683-462-8825, a Custom Management checking account, was opened on August 8, 2006. An analysis of this account revealed that between August 8, 2006 and December 31, 2006, $10,428.37 was deposited into the account, of which $10,373.37 was cash deposits. From January 1, 2007 thru April 30, 2007, $22,791.44 was deposited into this account, of which $22,700.00 was cash deposits. The application opening the account states that Bertolino was employed by Countrywide Mortgage. There was no indication of payroll deposits made into the account.

23. A review of Wells Fargo Bank account number 898-9646271, a Goal Savings account, opened on October 10, 2006, revealed that a total of $7,263.29 were deposited in the account for the year ending December 31, 2006. Of that total amount, $5,810 was cash deposits. Between January 1, 2007 and May 1, 2007, Bertolino deposited $18,173.14 into the account, of which $17,215 consisted of cash deposits. The application opening the account states that Bertolino was employed by Countrywide Mortgage. There was no indication of payroll deposits made into the account.

24. A Federal Grand Jury subpoena was also served on North Island Credit Union for financial records related to the bank accounts owned or under the control of Frank Bertolino for the period January 1, 2003 through the issuance of the subpoena, May 2007. Based on information received from the bank for Money Market account 115946105, Bertolino stated that he was employed as a Mortgage Consultant for World Wide Mortgages. The telephone number provided by Bertolino as proof of employment, 619-579-3800, belongs to a Hungry Howie's Pizza restaurant located at 123 Jamacha Boulevard, El Cajon, California. A employment verification telephone call placed to this number for Frank Bertolino was negative. A review of the deposit items shows no indication of payroll deposits being made to this account.

25. On May 29, 2008 a federal search warrant was executed on the residence of Frank Bertolino, Amanda Jean Holland (Bertolino's girlfriend), and Dominick Bertolino (Frank's brother) located at 1140 Monterey Drive, El Cajon, California. After the residence was secured, Amanda Jean Holland was read her non-custodial rights by DEA Special Agent Derek Kinninger and was asked if she would agree to be interviewed regarding her knowledge of the Bertolino's drug trafficking activities. Holland stated she understood her rights and agreed to be interviewed.

26. During the interview, Holland stated she has been in a relationship with Frank Bertolino for approximately six months, beginning in December 2007. Holland admitted that she was aware of Bertolino's reputation as a drug dealer and of his drug trafficking activities prior to their relationship. Holland said that Bertolino was well known in the east county area for his drug trafficking activities. Holland stated that Bertolino had no legitimate employment, but that he did tell her that he had worked at European Coach Car Company in the past selling used cars. Holland said that Bertolino also told their landlord that he was employed by European Coach Car Company. Holland stated that because of their intimate relationship she knew he was not legitimately *employed*

and had not observed him conduct himself like an individual that was employed as a car salesman.

27. Holland was asked about the engagement ring she was wearing during the interview. She stated that it was "a fake" that had cost Bertolino approximately $40 at a jewelry store at the mall. She stated she was wearing the fake ring while Bertolino continued to make payments on her "real ring" which was still being held at the jewelry store. Holland stated that she believed that her "real ring" cost approximately $10,000 and was purchased at a jewelry store in Parkway Plaza shopping mall in El Cajon, California. Holland did not remember the exact name of the store but stated it was related to Versailles Jewelers located at the Fashion Valley Mall in San Diego, California.

28. On June 6, 2008, David Levi, manager of Levi and Sons Jewelers, located at 309 Parkway Plaza El Cajon, California was interviewed regarding Frank Bertolino's purchase of an woman's engagement ring. Levi stated he personally had sold the ring to Bertolino and remembered the transaction well. Levi reviewed the specifics of the purchase transaction on his computer system and provided IRS Special Agents Deliena Chell and Eric Helfand with the following information. Bertolino paid $13,365.00 in cash for the engagement ring and it had been paid off since April 4, 2008. Levi noted that there had been three payments on the ring. The first cash payment of $3,000.00 was made on January 25, 2008; the second $3,000.00 cash payment was made on February 25, 2008 and third and final cash payment of $7,365.00 was made on April 4, 2008. Levi stated he was suspicious of Bertolino's regular cash payments because the cash always arrived at the store in plastic bags and Levi suspected that it may have been proceeds from illegal activities.

29. Levi indicated that Bertolino came to the store alone when conducting his transactions related to the ring. Levi stated Bertolino was always talking about "unusual things" while they conducted their business transactions. Levi specifically recalled that Bertolino had told him he

owned a four door Bentley that he had purchased from Mike Bibi. He also made a statement that he "laundered money for the European Car Company" located on Mission Gorge Road. Levi stated he was stunned by Bertolino's statement and questioned other employees if they had heard the same thing after Bertolino left the store. Each of the employees stated they had also heard Bertolino state he was a "money launderer."

30. Levi stated he had not sold additional jewelry to Bertolino but was aware that Bertolino liked expensive jewelry. Bertolino had told Levi that he wanted him to hold on to the ring until he was ready to propose and then he would have Levi ship the ring to Bisby, Arizona where he and his father had a residence. During one of the payment visits, Bertolino had commented to Levi that things "might not work out with his girl" because things had become "on again, off again." Bertolino told Levi not to worry about the ring because he would "order up" another two carat princess cut diamond and he would personally wear them together as earrings.

## CONCLUSION

31. Based upon the foregoing, I believe probable cause exists to believe that the money used to purchase the diamond engagement ring was from the sales and trafficking in illicit narcotics. Frank Bertolino III was trafficking in cocaine for the time period beginning at least in February 2007 through May 2008 and selling it for approximately $600 per ounce. Frank Bertolino III did not, and does not, earn substantial, if any, legal source income to be able to afford the purchase of the engagement ring.

32. Based upon the forgoing, I believe there is probable cause that the diamond engagement ring represents drug proceeds subject to forfeiture pursuant to Title 21, United States Code, Section 881 (a)(6) (proceeds of drug trafficking). I further believe probable cause has been established that the diamond engagement ring was acquired with funds traceable to a violation(s) of Title 18, United

States Code, Section 1956 and 1957 (money laundering), and subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1).

DATED:   August 14, 2008

By: *Angela K. Clark*
ANGELA K. CLARK, Special Agent
Internal Revenue Service

Subscribed and sworn to before me this 14th day of August, 2008.

*Ruben B. Brooks*

The Honorable ~~Anthony J. Battaglia~~ Ruben B. Brooks
United States Magistrate Judge